Milton **KOFFMAN,**
**Plaintiff/Counterclaim Defendant,**

v.

**OSTEOIMPLANT TECHNOLOGY, INC.,
et al., Defendants/Counterclaim
Plaintiffs.**

Civ. No. S 94–1485.

United States District Court,
D. Maryland.

May 4, 1995.

John S. Guttmann, Devarieste Curry, Deveridge & Diamond, Washington, DC, for plaintiff.

Franklin T. Caudill, David F. Albright, Sr., Cynthia E. Rodgers–Waire, Albright & Brown, Baltimore, MD, for defendants.

SMALKIN, District Judge.

### MEMORANDUM AND ORDER

For the third time, this case is before the Court on a motion for summary judgment. Having granted summary judgment for the plaintiff/counterdefendant, Milton Koffman, on the underlying cause of action on February 3, 1995, the Court is now presented with this motion for summary judgment on the defendant/counterplaintiff corporations' counterclaims. The counterclaims allege civil conspiracy, abuse of process, and malicious prosecution. Koffman maintains that the evidence before this Court is insufficient to convince any reasonable jury to find in favor of Osteoimplant Technology Inc. and Osteo–Technology International Inc. (collectively, "OTI") on any of these three common law causes of action. Koffman also argues that the second and third causes of action are preempted by federal law. OTI opposes the motion on the grounds that it has presented sufficient evidence to raise genuine issues of material fact and on the grounds that a preemption defense is not available in the circumstances of this case. The matter has been fully briefed, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

### I. Factual Background

The factual background to the underlying complaint in this case has been set forth in the Court's two prior memorandum opinions and need not be repeated here. See Memorandum Opinion and Order of February 3, 1995; Memorandum Opinion and Order of September 27, 1994. The facts pertaining to the counterclaims, however, go considerably beyond those relevant to the original complaint.

The course of events forming the basis of the allegations in OTI's counterclaims began when several entities, which are not parties to this lawsuit, filed involuntary bankruptcy petitions pursuant to Chapter 7 of the Bankruptcy Code against OTI in the Bankruptcy Court for the District of Maryland in mid–1993. According to OTI, Mr. Koffman was informed of the pendency of the bankruptcy proceedings in a letter from OTI's Vice–President and General Counsel, John Roberts, dated May 25, 1993. Mr. Roberts included with that letter a copy of the involuntary bankruptcy petition, as well as a Motion to Dismiss which OTI had filed with the bankruptcy court. Koffman maintains that he had no actual knowledge of the bankruptcy proceedings because the letter was sent to his New York office where he spends very little time, and it was never brought to his attention. Deposition of Milton Koffman, Motion for Summary Judgment on the Debtor's Counterclaims (Exhibit U), at 48–49. In contrast, OTI insists that the bankruptcy proceedings were discussed in several subsequent conversations between Mr. Koffman and Mr. Roberts. OTI has submitted a copy of allegedly contemporaneous notes taken by Mr. Roberts of such a phone conversation which, according to the notes, took place on June 29, 1993. Affidavit of John A. Roberts (with attachment), Opposition to Motion for Summary Judgment on the Counterclaims (Exhibit A).

OTI charges that Koffman conspired with the entities responsible for filing the involuntary bankruptcy petitions to harm OTI; however, Koffman insists that he has never spoken or had any other contact with any of those parties. Deposition of Milton Koffman, Motion for Summary Judgment on the Debtor's Counterclaims (Exhibit U), at 83–86, 96, 119. In response, OTI offers the sworn testimony of Mr. Roberts that Koffman told him in a phone conversation that he (Koffman) had been contacted by some of the petitioning creditors about joining the bankruptcy case. Affidavit of John A. Roberts (with attachment), Opposition to Motion for Sum-

mary Judgment on the Counterclaims (Exhibit A).

On August 18, 1993, Koffman, through his attorneys, sent a letter to OTI demanding full payment within seven days on the promissory notes at issue in this case. On October 8, 1993, Koffman filed an action in the United States District Court for the District of Maryland to collect the debt. This action was styled *Koffman v. Osteoimplant Technology, Inc. and Osteo–Technology International, Inc.*, Civil No. S–93–2928. On October 29, 1993, three days after OTI filed a motion in the bankruptcy court to show cause why sanctions should not issue for a violation of the automatic stay, Koffman dismissed his district court action. OTI argues that Koffman's demand for payment and federal lawsuit represent willful violations of the automatic bankruptcy stay.

After dismissing the district court action, Koffman moved to intervene in the bankruptcy proceedings on December 16, 1993. On January 3, 1994, Koffman filed a Complaint for Injunctive Relief in the bankruptcy court as well as an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction. The motion was denied by the Bankruptcy Judge on January 7, 1994. An affidavit signed by Mr. Koffman was attached to the Emergency Motion which alleged, in part, that "The president of Implant, Ian Murray, is about to leave the country and return to his native country, taking the remaining inventory with him." OTI maintains that this allegation was false and that Koffman knew that it was false at the time it was made. For this reason, OTI believes that Koffman acted in bad faith in filing this affidavit with the bankruptcy court.

United States Bankruptcy Judge Schneider eventually dismissed the involuntary bankruptcy petitions pursuant to 11 U.S.C. § 305, which is entitled "Abstention" and provides in relevant part that "The court, after notice and a hearing, may dismiss a case under this title ... at any time if—(1) the interests of creditors and the debtor would be better served by such a dismissal ..." 11 U.S.C. § 305(a). In his oral opinion, Judge Schneider indicated in *dicta* his belief that the origi-

nal petitioners acted in subjective bad faith in filing the bankruptcy petitions against OTI; however, he did not dismiss the petition for that reason. Transcript of Hearing Before the Honorable James F. Schneider, Supplemental Memorandum in Opposition to Motion for Summary Judgment on the Counterclaim (Exhibit C), at 3–5. Instead, Judge Schneider chose to abstain completely from the proceedings because "it is in the best interests of not only these putative debtors, but also the creditors who are locked in litigation elsewhere for them to pursue that litigation to its logical conclusion...." *Id.* at 6. According to his opinion, the Judge was persuaded that the disputes between OTI and its various creditors raised complex questions of non-bankruptcy law that could be handled more effectively and economically in other *fora. Id.* at 6–7. Finally, Judge Schneider noted his understanding that the effect of his abstaining from the proceedings under section 305 was that "there will not be any claims against the petitioning creditors for bringing these petitions. There will not be claims for damages, and there will not be claims for counsel fees. The parties who are already locked in litigation are free to raise whatever claims they have there." *Id.* at 7–8.

On June 1, 1994, approximately two months after Judge Schneider's dismissal of the bankruptcy petitions, Koffman filed this action in the district court.

## II. *Summary Judgment Standard*

As the Court has explained in its two prior memorandum opinions on summary judgment in this case, summary judgment should be granted if there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only if, when applied to the substantive law, the fact affects the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where the record could not support a finding by the trier of fact for the non-movant, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. *Count One—Civil Conspiracy*

■ OTI maintains that Koffman participated in a wide-ranging conspiracy to misuse the bankruptcy process to drive OTI out of business and gain possession of its inventory. Under Maryland law, "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Washington Suburban Sanitary Comm'n,* 259 Md. 206, 221, 269 A.2d 815, 824 (1970). In other words, the essential elements are 1) an agreement, understanding, or confederation to accomplish an unlawful act or to use unlawful means, 2) an unlawful act done in furtherance of the conspiracy, and 3) actual legal damage. *Van Royen v. Lacey,* 262 Md. 94, 98, 277 A.2d 13, 14 (1971); *Yousef v. Trustbank Savings, F.S.B.,* 81 Md.App. 527, 538, 568 A.2d 1134, 1139 (1990).

■ In this case, Koffman's motion for summary judgment on the civil conspiracy claim emphasizes the dearth of evidence on the first element of this tort—an agreement or understanding either to accomplish an unlawful act or to use unlawful means to accomplish an act which is not in itself unlawful. *Green,* 259 Md. at 221, 269 A.2d at 824. Koffman maintains that there is no evidence of any agreement between himself and the other alleged conspirators to perform an unlawful act or to use unlawful means for any purpose. In its opposition to this motion, OTI makes clear that the alleged goal of Koffman's conspiracy was "to collect his debt by acquiring the collateral (the LSF inventory) and selling it to Kirschner." Opposition to Motion for Summary Judgment on the Counterclaim, at 14.

Whether or not Koffman agreed with anyone about anything, it is abundantly clear that the purpose of the charged conspiracy between Koffman and others—to collect his debt and to acquire and resell the collateral—is not unlawful. This Court has held that the debt is owed by OTI to Koffman. Memorandum Opinion and Order of February 3, 1995. Although OTI attempts to cast a sinister light onto Koffman's decision to end his policy of forbearance and declare the debt in default, the goal of collecting monies owing to him is a proper one.

■ On the other hand, OTI's charges could be read to allege that the purpose of the conspiracy was not to accomplish an unlawful act, but rather to use unlawful means to accomplish an otherwise lawful act. In other words, although it is lawful to attempt to collect a debt, it is unlawful to do so by, for example, filing bad faith petitions in bankruptcy court. Thus, the Court must consider whether Koffman might have conspired with others to use unlawful means to collect on the notes. The unlawful means alleged are 1) filing of the first suit in federal district court in allegedly deliberate violation of the automatic stay imposed under 11 U.S.C. § 362, 2) joining and collaborating in the maintenance of bad faith involuntary bankruptcy proceedings, and 3) filing allegedly false affidavits with the bankruptcy court. Thus, this Court must examine the evidence as to whether there was an agreement between Koffman and any other person to use any such means to collect his debt.

■ There is no evidence which would convince a reasonable jury that Koffman conspired with anyone else either to file his first lawsuit in federal district court, to join the involuntary bankruptcy proceedings or to make certain allegations in an affidavit filed with the bankruptcy court. The only evidence of any contact between Mr. Koffman and the other alleged conspirators comes in the form of an affidavit from Mr. Roberts and his notes from a telephone conversation with Koffman. Mr. Roberts claims that in a phone conversation on June 29, 1993, Koffman told him that "he had been contacted by some of the involuntary bankruptcy petitioners, including Kirschner Medical Corporation." Affidavit of John A. Roberts, Opposition to Motion for Summary Judgment on the Counterclaim (Exhibit A). Mr. Roberts' attached notes of that conversation indicate that Koffman told him that petitioners Kir-

schner, Komtek and Brimfield "would like to see Milt join them," but that "Milt wants to stay with us" and "thinks that we should try to work something out with all parties." *Id.* (attachment). Mr. Roberts' deposition testimony is consistent with this affidavit. Deposition of John A. Roberts, Motion for Summary Judgment on the Debtors' Counterclaims (Exhibit X), at 97, 131.

■ No reasonable jury could conclude from this scant evidence that Koffman conspired with others to collect his debt by unlawful means. As the Maryland courts have emphasized, "there is a limit to the degree of indirection and innuendo which the law will tolerate." *Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 386, 454 A.2d 367, 372 (1983). An inference that Koffman conspired to violate the law does not arise from the fact that he once might have had a telephone conversation with other creditors of OTI. In fact, Mr. Roberts' notes and Koffman's subsequent actions support the opposite inference—that Koffman refused to join the alleged "scheme." It is true that after the dispute dragged on for another five months and his foray into district court backfired, Koffman did petition to join the involuntary bankruptcy proceedings; however, there is not a scrap of evidence before this Court that his action was the result of a consciously undertaken conspiracy with the other petitioners.

A final point is relevant to the issue of whether an agreement was reached between Koffman and the other petitioners. Since this case was instituted, the parties have debated whether Koffman and Allan Lyons are partners. In this motion, OTI maintains that the partnership issue is relevant because Mr. Lyons had contacts with petitioner Kirschner. OTI argues that Allan Lyons' actions are legally attributable to Mr. Koffman, and that they provide further evidence of an agreement between Koffman, Kirschner and the other alleged conspirators. Whether or not this legal theory has any merit, summary judgment on this cause of action is still appropriate, because no reasonable jury could find that Lyons' actions constituted an agreement to use unlawful means to collect the debt.

■ Lyons' actions consist of approximately two telephone conversations with C. Scott Harrison, the President of Kirschner Medical Corporation. Apparently, Lyons was searching for a buyer for the inventory collateral. Deposition of Allan Lyons, Opposition to Motion for Summary Judgment on the Counterclaim (Exhibit E), at 33–45. Again, however, OTI has provided no evidence that Lyons agreed with Harrison or anyone else to use *unlawful means* to collect the debt. A creditor's attempt to locate a buyer for a type of highly specialized collateral is proper and understandable behavior. A conversation regarding resale of collateral cannot raise an inference of agreement to use *unlawful means* to collect the debt. There is no evidence that the men discussed misusing the bankruptcy process in any of the manners alleged. No affidavit before this Court presents any evidence that Lyons discussed Koffman's filing of a separate lawsuit in federal court, joining involuntary bankruptcy proceedings in bad faith or misleading the bankruptcy court with groundless allegations in order to collect the debt.

OTI would have this Court assume that any discussions regarding OTI among any of its many creditors amount to conspiratorial agreements to harm the company. On the basis of all the evidence before it, the Court will not make that leap and no reasonable jury could do so either. As the Supreme Court made clear in *Liberty Lobby,* "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. 477 U.S. at 252, 106 S.Ct. at 2512. In this case, it might be too generous to describe the evidence presented on the agreement issue as amounting to a "scintilla."

Because there is no evidence that would convince a reasonable jury that Koffman agreed with others to use unlawful means to collect his debt, this Court need not address whether unlawful acts were done in furtherance of the conspiracy or whether OTI suffered actual damages. Koffman's summary judgment motion will be granted on this cause of action. If a conspiracy exists anywhere in this case, it is only in the counterclaimants' fancy.

IV. *Counts Two and Three—Abuse of Process and Malicious Prosecution*

▮ Koffman maintains that OTI's state law tort claims for abuse of process and malicious prosecution are preempted by federal bankruptcy law. The conduct which is the subject of these causes of action occurred in the federal district and bankruptcy courts and is alleged to violate certain provisions of the Bankruptcy Code. The question presented is whether federal remedies—most importantly, those provided by sections 362(h) and 303(i) of the Bankruptcy Code—preempt the state law causes of action alleged in the counterclaim. The issue is an important one as it represents a conflict between the states' traditional authority to provide tort remedies to their citizens, *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984), and Congress' express Constitutional authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States," U.S. Const. art. I, § 8, cl. 4.

A. *Basic Preemption Doctrine*

▮ The Supremacy Clause of Article VI of the United States Constitution provides Congress with the power to preempt state law. *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Congressional intent is the key factor in determining whether federal law preempts state law. *California v. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). Federal law may supersede state law in several different ways. *See generally Louisiana Pub. Serv. Comm'n*, 476 U.S. at 368–69, 106 S.Ct. at 1898. Most obviously, Congress can expressly state its intent to preempt state law. *E.g., Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Even without express Congressional direction, however, an intent to preempt state law will be implied from a federal statute where Congress has legislated comprehensively and occupied an entire field of regulation, thus leaving no room for supplemental state regulation. *E.g., International Paper Co. v. Ouellette*, 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Congressional intent to preempt state law will also be implied where an actual conflict exists between state and federal law, *Free v. Bland*, 369 U.S. 663, 668, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962), or where state law "stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See also Hillsborough County v. Automated Medical Lab. Inc.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985) (enunciating circumstances, including those listed *supra*, in which federal law will preempt state law); *Pacific Gas and Elec. v. Energy Resources Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) (same).

▮ It is uncontested that no express provision of the Bankruptcy Code preempts state law remedies for abuse of process or malicious prosecution. The Court's analysis necessarily focuses on the extent to which Congress has occupied the field of sanctioning improper behavior in bankruptcy proceedings, and the extent to which allowing state courts to rule on the propriety of actions taken in a federal court in alleged violation of federal statutes would present an obstacle to the achievement of the objectives of Congress in enacting the Bankruptcy Code.

B. *Preemption in the Context of Bankruptcy Remedies*

Because Congress has the constitutional power to preempt state law, U.S. Const. art. VI, as well as the constitutional power to enact laws governing bankruptcies, U.S. Const. art. I, § 8, cl. 4, a number of courts have concluded that, by enacting the Bankruptcy Code, Congress has preempted some state activity on matters affecting bankruptcy. *E.g., In re Demoff*, 90 B.R. 391, 396 (Bankr.N.D.Ind.1988) (citing cases); *In re Schnupp*, 64 B.R. 763, 768 (Bankr.N.D.Ill. 1986) (In the bankruptcy context, "where state law frustrates or burdens federal policy that state law must give way"). On the other

**124**

hand, because the common law of the various states provides much of the legal framework for the operation of the bankruptcy system, it cannot be said that Congress has completely preempted all state regulation which may affect the actions of parties in bankruptcy court. "Where the Bankruptcy Code is silent, and no uniform bankruptcy rule is required, the rights of the parties are governed by the underlying non-bankruptcy law." *Paul v. Monts,* 906 F.2d 1468, 1475 (10th Cir.1990). Remedies and sanctions for improper behavior and filings in bankruptcy court, however, are matters on which the Bankruptcy Code is far from silent and on which uniform rules are particularly important.

#### 1. *Federal Bankruptcy Code Scheme of Remedies*

The Bankruptcy Code provides extensive federal remedies for improper behavior in bankruptcy proceedings. For example, section 303(i)(2) of Title 11 authorizes the imposition of sanctions for involuntary bankruptcy petitions filed in bad faith, and section 362(h) provides that an individual injured by any willful violation of an automatic stay can recover actual damages as well as punitive damages in some circumstances. These two remedies, independent rights of action under the Bankruptcy Code, are directed at precisely the type of conduct alleged by OTI in this case.

##### a. *Section 303(i)*

Any creditor who files an involuntary bankruptcy petition in bad faith may be required to pay "any damages proximately caused by such a filing," as well as punitive damages. 11 U.S.C. § 303(i)(2). A materially false statement in support of an involuntary petition constitutes bad faith for purposes of section 303(i)(2). *In re Kidwell,* 158 B.R. 203, 217 (Bankr.E.D.Cal.1993). *See also In re Wavelength, Inc.,* 61 B.R. 614, 620 (9th Cir. BAP 1986). Moreover, under this statute, intervening creditors generally take on the status of petitioning creditors and are likewise subject to the section 303(i) remedy. *In re Kidwell,* 158 B.R. at 216; *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 867 n. 5 (9th

Cir.1976), *cert. denied,* 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976).

##### b. *Section 362(h)*

The automatic stay is the central feature of the Bankruptcy Code and works to prevent creditors from taking any further action against a debtor who has filed for bankruptcy except through the bankruptcy court. In 1984, Congress added subsection 362(h) to the Code to provide an explicit sanction for willful violations of this automatic stay. *Price v. Rochford,* 947 F.2d 829, 831 (7th Cir.1991). The statute provides that "[a]n individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). Congress did not enact a statute of limitations on actions under section 362(h) and the remedy is available even after the bankruptcy proceedings have terminated. *Price,* 947 F.2d at 831–32; *Nelson v. Post Falls Mazda,* 159 B.R. 924, 925 (Bankr.D.Idaho 1993).

##### c. *Other Bankruptcy Code Remedies*

In addition to these causes of action, the Bankruptcy Code contains numerous other provisions directed toward regulating the use of the bankruptcy process and the conduct of the parties in bankruptcy court. For example, 11 U.S.C. § 105(a) provides that the court "may issue any order, process, or judgment that is necessary or appropriate ... to prevent an abuse of process." Other remedies include 11 U.S.C. § 727(a)(4)(B), which authorizes a denial of discharge for presenting fraudulent claims, Rule 1008 of the Federal Rules of Bankruptcy Procedure, which requires filings to "be verified or contain an unsworn declaration" of truthfulness under penalty of perjury, and Rule 9011, which authorizes sanctions for signing certain documents not "well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *See generally Taylor v. Freeland & Kronz,* 503 U.S. 638, 644, 112 S.Ct. 1644, 1648, 118 L.Ed.2d 280 (1992) (listing remedies).

#### d. *Civil Contempt Powers*

In addition to the statutory remedies already described, most courts which have considered the issue have held that bankruptcy judges also have the power to impose certain contempt sanctions on the parties appearing before them. *E.g., In re Ragar,* 3 F.3d 1174, 1178–80 (8th Cir.1993); *In re Power Recovery Sys. Inc.,* 950 F.2d 798, 802 (1st Cir. 1991); *In re Skinner,* 917 F.2d 444, 447–50 (10th Cir.1990); *Burd v. Walters,* 868 F.2d 665, 669–70 (4th Cir.1989). *But see In re Sequoia Auto Brokers, Ltd.,* 827 F.2d 1281, 1284–90 (9th Cir.1987).

■ Although the Bankruptcy Code includes all the remedies described above, as well as others, these provisions, standing alone, are insufficient to imply congressional intent to preempt all state activity in the area. The mere existence of a detailed and extensive regulatory scheme does not by itself imply an intent to preempt state remedies. *English v. General Elec. Co.,* 496 U.S. 72, 87, 110 S.Ct. 2270, 2279, 110 L.Ed.2d 65 (1990). In addition, courts must consider whether there are "special features" which warrant preemption. *Id.* In this case, such special features exist not because Congress has clearly evidenced its intent to occupy the entire field of bankruptcy remedies, but rather because allowing the common law causes of action asserted by OTI to go forward would frustrate the congressional purpose in enacting the federal scheme. *See Hines,* 312 U.S. at 67, 61 S.Ct. at 404.

#### 2. *State Law Remedies Conflict with the Federal Scheme*

■ Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction, *Gonzales v. Parks,* 830 F.2d 1033, 1035 & n. 6 (9th Cir.1987), and federal law provides a remedy for filings made in bad faith, 11 U.S.C. § 303(i). Similarly, the automatic stay is imposed exclusively as a matter of federal bankruptcy law, *Matter of Flynn,* 169 B.R. 1007, 1022–23 (Bankr.S.D.Ga.1994), and the Bankruptcy Code provides a remedy for willful violations of that stay, 11 U.S.C. § 362(h). *See also Budget Serv. Co. v. Better Homes of Virginia, Inc.,* 804 F.2d 289, 292 (4th Cir.1986) ("state created rights have nothing to do with the application of the automatic stay").

■ Allowing state tort actions based on allegedly bad faith bankruptcy filings or violations of the automatic stay to go forward ultimately would have the effect of permitting state law standards to modify the incentive structure of the Bankruptcy Code and its remedial scheme. Because such a result threatens to erode the exclusive federal authority in this area, and because it would threaten the uniformity of federal bankruptcy law, the Court finds that OTI's state tort suits are preempted by the federal Bankruptcy Code. *See Gonzales,* 830 F.2d at 1036 ("A congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant.").

The Ninth Circuit has squarely addressed preemption of the state law remedies of abuse of process and malicious prosecution by the Bankruptcy Code, and its opinion in *Gonzales v. Parks,* 830 F.2d 1033, 1035 & n. 6 (9th Cir.1987), is thorough and persuasive. The *Gonzales* court held that state law claims for abuse of process and malicious prosecution stemming from an alleged bad faith filing of an involuntary bankruptcy petition were preempted by Bankruptcy Code remedies. 830 F.2d at 1035–36. The court reasoned that allowing such claims to go forward would result in a state court determining whether relief is justified under a federal law, in a federal court, on matters within the federal court's exclusive jurisdiction. *Id.* at 1035. State courts would develop standards as to when persons could properly seek relief in federal court for claims which Congress has specifically precluded the state courts from adjudicating themselves. *Id.* This anomalous situation is wholly at odds with the exclusive jurisdiction of federal courts over the filing of bankruptcy petitions. *See Gonzales v. AM Community Credit Union,* 150 Wis.2d 773, 442 N.W.2d 536, 539 (Ct.App. 1989) ("Since filings are exclusively within the province of the federal courts, attacks on filings must be mounted in the federal courts.").

■ In addition to being inconsistent with exclusive federal jurisdiction, allowing

state law tort suits to go forward would prejudice the operation of the Bankruptcy Code in an impermissible manner. Parties could be deterred from exercising their rights in bankruptcy if, by filing a bankruptcy petition, they risk being faced with a state court lawsuit and liability for substantial damages. *Gonzales,* 830 F.2d at 1036. "It is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized." *Id. See also Taylor,* 503 U.S. at 643–46, 112 S.Ct. at 1648–49 (To the extent that existing federal remedies do not deter bad-faith behavior in bankruptcy proceedings, "*Congress* may enact comparable provisions to address the difficulties") (emphasis added).

■■■ Allowing collateral attack on bankruptcy petitions filed in federal court would also threaten the uniformity of federal bankruptcy law provided for in the Constitution. U.S. Const. art. I, § 8, cl. 4. Exclusive federal jurisdiction over bankruptcy proceedings would mean little if standards of conduct in bankruptcy proceedings varied from state to state, and from state to federal court. *See Gene R. Smith Corp. v. Terry's Tractor, Inc.,* 209 Cal.App.3d 951, 954, 257 Cal.Rptr. 598, 600 (1989) ("Different standards defining identical conduct adds an unnecessary and confusing component to the uniform law to be applied in bankruptcy proceedings."), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 493 (1990). In these circumstances, allowing state law to impose different standards and incentives would impose "an obstacle to the accomplishment and execution of the full objectives of Congress" in enacting the Bankruptcy Code, granting federal courts original and exclusive jurisdiction over core proceedings, and providing for uniform remedies. *See Louisiana Pub. Serv.*

*Comm'n,* 476 U.S. at 368–69, 106 S.Ct. at 1898.

In addition to the Ninth Circuit, other federal and state courts have found that sections 362(h) and 303(i) of the Bankruptcy Code have preemptive power over state law claims of abuse of process and malicious prosecution.[1] For example, the bankruptcy court in *In re Shape,* 135 B.R. 707 (Bankr. D.Maine 1992), held that where the same set of facts formed the basis of a violation of an automatic stay claim and a state law claim, the Bankruptcy Code's "comprehensive" and independent "enforcement scheme and separate adjudicative framework ... must supersede any state law remedies." *Id.* at 708. Similarly, in *Matter of Flynn,* the court emphasized that the 362(h) cause of action arises solely from the violation of a "particularly federal right," and not any duty created under state law. 169 B.R. at 1022–23.

Several state courts also have addressed the precise issues before this Court and held that abuse of process and malicious prosecution claims arising out of involuntary bankruptcy proceedings are preempted. For example, in *Gene R. Smith Corp. v. Terry's Tractor, Inc.,* 209 Cal.App.3d 951, 953–54, 257 Cal.Rptr. 598, 599–600 (1989), the court followed the Ninth Circuit's *Gonzales* decision in holding that both abuse of process and malicious prosecution claims based on an involuntary bankruptcy petition filed in bad faith were preempted by bankruptcy law in large part because federal remedies were intended to be exclusive for misconduct in federal bankruptcy court. Similarly, in *Edmonds v. Lawrence Nat'l Bank & Trust Co.,* 16 Kan.App.2d 331, 333, 823 P.2d 219, 221–222 (1991), the court explicitly adopted the reasoning of *Gonzales* in holding that malicious prosecution and abuse of process claims were preempted. *See also Idell v. Goodman,* 224 Cal.App.3d 262, 269–70, 273 Cal.Rptr. 605, 609–10 (1990) (following *Gonzales* in finding malicious prosecution claim preempt-

---

1. In a related context, federal courts have emphasized the exclusivity of bankruptcy remedies in holding that no cause of action exists under 42 U.S.C. § 1983 for alleged violations of the Bankruptcy Code. *E.g., In re Saunders,* 105 B.R. 781, 784 (Bankr.E.D.Pa.1989) ("Congress intended to establish a comprehensive enforcement mecha-

nism for violations of the automatic stay ... as a result, ... no additional cause of action exists by virtue of § 1983."); *Periera v. Chapman,* 92 B.R. 903, 908 (C.D.Cal.1988) (statutory scheme provided by the Bankruptcy Code reflects a "balance, completeness and structural integrity that suggests remedial exclusivity").

ed by federal bankruptcy remedies); *Sarno v. Thermen*, 239 Ill.App.3d 1034, 1040–44, 180 Ill.Dec. 889, 893–96, 608 N.E.2d 11, 15–18 (1992) (state law conspiracy claim preempted by section 303(i) of the Bankruptcy Code). For all of the foregoing reasons, the Court finds that OTI's state law claims of abuse of process and malicious prosecution are preempted by federal law.

## C. *OTI's Remedies in this Case*

■ OTI has defended the validity of its state law claims in vaguely equitable terms. OTI maintains that no federal remedies were actually available to it in the bankruptcy court because Judge Schneider, acting pursuant to section 305(a)(1) of the Bankruptcy Code, formally abstained from hearing the involuntary petition on the grounds that the interests of the creditors and debtor would thereby be better served. Some courts have held that the Bankruptcy Code remedies provided by section 303(i) do not apply when the bankruptcy court dismisses or abstains from hearing the petition pursuant to 11 U.S.C. § 305, rather than dismissing it as filed in bad faith under 11 U.S.C. § 303(i). OTI concludes that its state law claims cannot be preempted by section 303(i), because such a result would leave it without a remedy for the allegedly bad faith filing of the involuntary bankruptcy petition in this case.

Authority is mixed regarding whether the remedies of section 303(i) are available when the bankruptcy judge abstains under section 305. *Compare In re Kidwell*, 158 B.R. 203, 217 (Bankr.E.D.Cal.1993) ("The correct view is that section 303(i) does apply to dismissals under section 305") *and In re Trina Assoc.*, 128 B.R. 858, 873 (Bankr.E.D.N.Y.1991) (dismissing case under section 305 and entertaining award of damages pursuant to section 303(i)) *with In re Sun World Broadcasters, Inc.*, 5 B.R. 719, 722 (Bankr.M.D.Fla.1980) ("the costs and fees allowable under § 303(i) are not possible in a case that is dismissed under § 305") *and In re R.V. Seating, Inc.*, 8 B.R. 663, 666 (Bankr.S.D.Fla.1981) ("§ 305, unlike § 303, does not authorize the Court to award damages, attorney's fees, or costs").

■ In light of the crystalline legislative history on this issue, the Court has difficulty understanding the split of authority. In describing the intended effect of section 303(i), both the House and Senate Reports note that "[d]ismissal in the best interests of creditors under section 305(a)(1) would not give rise to a damages claim." H.R.Rep. No. 595, 95th Cong., 1st Sess. 324, *reprinted in* 1977 U.S.C.C.A.N. 5963, 6280; S.Rep. No. 989, 95th Cong., 2d Sess. 34, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5820. This result makes intuitive sense. The essence of section 305(a)(1) is a determination that the "interests of creditors and the debtor would be better served" by dismissing the petition and allowing them to negotiate a "less expensive out-of-court workout." 1977 U.S.C.C.A.N. at 6280; 1978 U.S.C.C.A.N. at 5822. The legislative history makes clear that abstention under section 305 "is of jurisdiction over the entire case." *Id.* It would be paradoxical for the bankruptcy court to refuse to exercise jurisdiction on the grounds that the parties' interests are best served by the court's noninvolvement, yet then to entertain a suit for damages stemming from the same bankruptcy proceedings. The parties can either resolve the issues surrounding an involuntary bankruptcy petition in the bankruptcy court or they can resolve them on their own outside the bankruptcy court. They cannot, however, have it both ways. After the bankruptcy court abstains from jurisdiction over an involuntary petition pursuant to section 305(a)(1), the court may not then award damages or impose sanctions for the filing of that petition under section 303(i).

It also follows from this statutory scheme that no substitute state law cause of action should be available either. Congress intended that no claims arise from a bankruptcy judge's abstention from a case. The Congressional intent to bar access to damages provided under section 303(i) to parties involved in a section 305(a)(1) dismissal would be wholly thwarted by allowing awards of similar or greater magnitude in state courts. This is a situation where state law not only would hinder the accomplishment of congressional objectives, but also would conflict with federal law outright. *See Free*, 369 U.S. at 668, 82 S.Ct. at 1092. For these reasons, OTI's position—that its state tort claims can-

not be preempted because the federal remedy for filing an involuntary petition in bad faith is unavailable—is exactly backward. In a very real sense, the state law claims are preempted precisely *because* Congress has determined that no remedy in warranted or appropriate in these circumstances.[2]

The *foregoing does not necessarily imply* that no bankruptcy remedies are available to OTI. OTI once attempted to request sanctions for Koffman's alleged willful violation of section 362 in filing the October 1993 lawsuit in federal court. The motion for sanctions was denied, however, because the request was not made in the appropriate manner—*i.e.*, it was made by motion instead of by the filing of a new complaint. [Unsigned] Show Cause Order (with handwritten notation), Reply to Opposition to Motion for Summary Judgment on the Counterclaims (Exhibit DD). Although Judge Schneider informed it of the deficiency, OTI did not follow up and correct its mistake in the bankruptcy court, instead choosing to file these state law causes of action later in a separate, non-bankruptcy proceeding.

 Judicial economy would be served by preventing this dispute from being re-litigated in the bankruptcy court upon any future complaint under section 362(h) of the Bankruptcy Code.[3] As this Court is familiar with the facts and issues presented by this case, any continuing dispute will be litigated here. Although only the amount of damages to be awarded to Mr. Koffman on his underlying complaint currently remains to be decided in this case, the Court will grant OTI leave to file an amended counterclaim within 21 days should it desire to take advantage of remedies which might be available under section 362(h).[4]

Plaintiff's motion for summary judgment is hereby GRANTED, this 4th day of May 1995.

---

**2.** For a contrary view, compare *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 52 (3rd Cir.1988) (reasoning that because section 303(i) is not available where debtor has converted a Chapter 7 proceeding to a Chapter 11 proceeding, it cannot be an exclusive remedy in that situation and remanding on abuse of process and malicious prosecution claims). The policy supporting abstention under section 305(a), however, is not analogous to that supporting conversion pursuant to 11 U.S.C. § 706, and thus the reasoning of the *Paradise Hotel* court is inapposite to the instant case.

**3.** In the Fourth Circuit, this remedy is available to a corporate debtor. *Budget Serv. Co.*, 804 F.2d at 292.

**4.** Any effect of Local Rule 402 providing for automatic reference to the Bankruptcy Court of such a claim is hereby waived pursuant to Local Rule 604. Although a claim for damages under section 362(h) is a "core" proceeding and normally would be referred to the Bankruptcy Court, such reference is not mandated by statute as the District Court has original jurisdiction over all civil proceedings under the Bankruptcy Code pursuant to 28 U.S.C. § 1334(a). *Price*, 947 F.2d at 832 n. 1.